UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

Hearing Date and Time:
February 6, 2024 at 11:30 a.m.

-------------------------------------------------------------x

In re:                                          Chapter 11

SDS Colcon LLC,                                 Case No. 23-43469-NHL

                         Debtor.

-------------------------------------------------------------x

In re:                                          Chapter 11

SDS Colcon Owner LLC,                           Case No. 23-44130-NHL

                         Debtor.

-------------------------------------------------------------x

**DEBTORS' JOINT OPPOSITION TO THE MOTIONS OF TIG ROMSPEN US
MASTER MORTGAGE LP FOR RELIEF FROM THE AUTOMATIC STAY**

SDS Colcon LLC ("Member Co.") and SDS Colcon Owner LLC ("Property Co.")

(collectively, the "Debtors") as and for their Joint Opposition to the motions of TIG Romspen US

Master Mortgage LP (the "Secured Lender") seeking vacatur of the automatic stay under 11 U.S.C.

§362 (the "Motions"), respectfully state and allege as follows:

**Preliminary Statement**

1.      The Debtors' Chapter 11 cases are not the failed enterprise that the Secured Lender

suggests.  Even though the Debtors' eleven unit residential condominium redevelopment project

(the "Project") at 63 Columbia Street, Brooklyn, NY 11201 (the "Property") is not yet fully

complete, most of the construction is done.  Generally speaking, the Project is about 65%-70%

finished, with all exterior work done.  The consensus is that the total hard costs to complete

construction (mostly finishing work) will aggregate $3-$3.5 million plus soft costs of another $1.5-

2.0 million which include all accrued real estate taxes, insurance, payment of liens and

administrative expense claims.  Given the current status, the best path forward is for the major

1

stakeholders (*i.e.*, the Debtors, the Secured Lender, the Investors and the Committee) to renew their discussions relating to DIP financing and scope of the completion budget.

2.     Indeed, the Motions were filed in the midst of discussions regarding a potential internally driven DIP loan to be jointly funded by the Secured Lender and the Investors. As of December 19, 2023, the parties were reviewing budgets, as highlighted by the exchange of emails attached hereto as Exhibit "A", only to see the Secured Lender file the Motions the very next day on December 20, 2023, without any true heads-up to either the Debtors or the Investors.

3.     If the Motions were intended to get the Debtors' attention, they have served their purpose, but it has not been established that the Debtors are incapable of completing the Project or successfully reorganizing. Indeed, a determination of the overall equity in the Project must take into consideration the future stabilization of the asset and a total sell-out price for the eleven residential units.

4.     The bottom line economics of the Project is that the building has net saleable square footage of about 13,350 square feet without amenities or parking. Based on an average sale price of $1,725 per square foot, the Property can generate a sell-out of at least $23 million, plus additional revenues for parking. The Debtors, however, believe that by the time the units go to market, they can trade at a price of $1,800-$1,900 per square foot. Thus, it is truly shortsighted to analyze the Debtors' reorganization prospects without at least providing a reasonable opportunity to complete the Project. This is particularly true in connection with a motion for stay relief where the Debtors are entitled to an opportunity to formulate a plan within a reasonable period of time. *See, United Savings Association v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 375-76, 180 S.Ct. 626 (1987) ("*Timbers*").

5.     Since the Motions were filed the Debtors have taken a number of significant steps toward procuring outside DIP financing including obtaining a term sheet from Maxim Capital, a copy of which is annexed hereto as <u>Exhibit</u> "B".   Moreover, the Debtors are in discussions with two potential new replacement contractors (JK Equities and AKI Construction) and have received estimates for completion of the Project to replace the Debtors' current developer and principal, Louis Greco.  While much remains to be done, a foreclosure adds little to the equation, except inviting a distressed sale at a fraction of the Property's stabilized value.

6.     Moreover, this is not a two-party dispute – there are several other interests which need to be considered, including those of the Creditors' Committee appointed on January 30, 2024. Rather than lift the automatic stay, the Court instead should direct that all parties return to the bargaining table and negotiate the various construction proposals on the best possible terms with the goal of resuming construction as soon of possible based on the best priced DIP financing.

### Lead Up to the Bankruptcy

7.     The Secured Lender holds a first mortgage lien against the Property as well as a pledge of the membership interest, each securing a common debt with a principal balance of $13,407,431.51 plus accrued interest and reserves.  However, contrary to the Motions, the Debtors were never billed for default interest.  The last pre-petition billing statement, issued on October 20, 2023 annexed hereto as <u>Exhibit</u> "C", reflects a total combined debt of $15,167,279 including principal of $13,407,431, interest of $1,681,001.79 and escrow of $78,847. This is a more manageable level than the sum of more than $18 million claimed by the Senior Lender for purposes of the Motion.

8.     The Property is located in the Cobble Hill section of Brooklyn within a highly respected school district (P.S. 229), making it attractive to young professional families.  There is very little dispute that if the Project is completed there is a strong demand for the sale of the units.

9.     Construction began in earnest in 2017 and continued in spurts thereafter.  Work was first interrupted by litigation with neighboring property owners regarding the underpinnings for the construction and the terms of an access agreement.  This litigation was settled in 2018. After the disputes with the neighbors were resolved, the Debtor experienced another setback due to the need for National Grid to relocate a high-pressure gas line at the Property, which caused about a nine month delay.

10.    By early 2020, the  foundation and all outside structural work was completed when Covid-19 struck, and the Project was delayed again.  All work on the Project ceased entirely in November 2022 due to the implications of cost over runs, a large part of which were attributable to the pandemic.  The consensus among the parties was that the budget to complete was insufficient, leaving the Project in need of added liquidity and financing.

11.    As of spring of 2023, it was believed that the project was back on track, after an agreement in principle was negotiated with the Secured Lender to provide additional financing under a proposed Second Building Loan Agreement in the principal sum of $3.3 million.  The proposed loan is reflected in the attached Loan Closing Checklist and draft agreement collectively annexed hereto as Exhibit "D".  A closing was scheduled for April 1, 2023, but at the last minute an objection was raised to the financing by Robert Toan concerning the projected sell-out values in conjunction with the Debtors' various marketing studies.  Mr. Toan is the Chairman of Intervest Capital Partners with strong ties to overseas investors.  After additional negotiations stalled out, the Secured Lender declared a default and scheduled a UCC Article 9 foreclosure auction sale of

Member Co.'s equity interest in the Property Co. for September 28, 2023. This led to the instant Chapter 11 proceedings.

## Procedural History in Bankruptcy

12.     On September 27, 2023, an involuntary petition was commenced against Member Co. by the Investors, which by that time had exercised option and put rights to convert most of their equity to debt. Member Co. subsequently consented to entry of an Order for Relief under Chapter 11 of the Bankruptcy Code on November 20, 2023. In the meanwhile, Property Co. filed a separate voluntary petition under Chapter 11 of the Bankruptcy Code on November 13, 2023. A motion for the joint administration of the respective bankruptcy cases is returnable simultaneously with the hearing on the instant Motions. The Debtors are still operating within the initial ninety (90) day period for filing a plan of reorganization under 11 U.S.C. §362(d)(3).

13.     During earlier conferences before the Court, it was reported that the parties were discussing funding a potential DIP loan among themselves. DIP Financing (whatever the source) is the key to achieving maximum value for the Property. In many respects, the Secured Lender remains wedded to the Debtors since the Debtors have already obtained approval from the Attorney General for the Condominium offering plan as per the attached acceptance letter dated August 16, 2022, a copy of which is annexed hereto as <u>Exhibit</u> "E". The offering plan must be extended past August 2023 to be explained by the Debtors' pre-petition condominium counsel in a document to be filed as a supplement hereto. The Senior Lender is better off if the Debtors complete the Project since under a foreclosure the Secured Lender would effectively substitute a sponsor and thereby become responsible for the quality of all of the sponsor's prior construction, something that lenders are generally reluctant to do. Thus, the parties should all be incentivized to complete construction within the contours of the current AG approval.

14.     Not unexpectedly, the Secured Lender focuses on the current "as is" value of the Project in its current state of partial completion, yielding a purported distressed value of about $11.1 million.  By contrast, the projected "sell-out" price for the Project is much higher, as noted by the attached Broker's Opinion of Value prepared by Compass Realty, which is the selling agent for the building.  Compass Realty has already started marketing efforts and projects a sell-out of at least $23 million and likely more given improving market conditions and added parking revenues.  Thus, even with repayment of a DIP loan there is a potential for a higher recovery if the construction resumes and sales begin.  Copies of the Broker's Opinion of Value and the Debtor's proposed Exclusive Sales Agreement with Compass Realty are attached as <u>Exhibits</u> "F" and "G", respectively.

15.     It is also noteworthy that a close neighboring property at 76 Congress Street is also under development as a 10-unit residential condominium and is being sold at a price of $1,881 per square foot.  The Debtors believe that the Property will command equal or better pricing than 76 Congress Street so that the Property could, in fact, achieve a total $25 million sell-out price.  An analysis of pricing for 76 Congress Street is annexed hereto as <u>Exhibit</u> "H".

<b>Post-Petition Efforts to Resume Construction</b>

16.     From day one of the bankruptcies, the Debtors have been committed to resuming construction and have sought DIP financing and replacement contractors.  Although Mr. Louis Greco will remain as the condominium sponsor, it is readily acknowledged that the Project needs fresh blood for completion.  Thus, a new general contractor will be retained under any scenario. Moreover, the Debtors are prepared to retain a construction consultant designated by the Secured Lender as an added level of supervision.

17. Discussions concerning DIP financing first envisioned the Secured Lender and Investors contributing equally a $3.5 million post-petition credit facility. In conjunction with pursuit of financing, the Debtors have consulted with two potential replacement contractors, JK Equities and AKI Construction, which have submitted proposals and estimates for consideration by creditors. Copies of the respective proposals are annexed hereto as <u>Exhibits</u> "I" and "J".

18. JK Equities has access to its own capital and can effectively finance the construction at a rate of 12% per annum under a senior position, whereas AKI Construction would require the Debtors to obtain a separate DIP loan with Maxim Capital Corp. or another source. Maxim is proposing to make a DIP Loan with primacy over all pre-existing mortgages in the total sum of approximately $5,925,000, including interest reserves, adequate protection and related fees and expenses.

19. All of these proposals are preliminary, but the point to emphasize is that the Debtors can present viable options to the Secured Lender to significantly improve on the liquidation value of the Project. Accordingly, there is a reasonable path forward and confirmation of a plan is still very possible. Moreover, the Debtors are cognizant that the Builders Risk Construction Policy must be extended beyond February 17, 2024 and discussions with Investors are ongoing to separately fund the insurance coverage pending completion of negotiations on DIP financing. The Debtors comprehensive liability policy runs through September 18, 2024. Copies of the insurance certificates are annexed hereto as <u>Exhibits</u> "K" and "L".

**Stay Relief Should be Denied**

20.     The Senior Lender has not met its burden to establish that stay relief is warranted at this juncture of the bankruptcy.  Instead, the Debtors are still entitled to protection under the automatic stay which is the central benefit of Chapter 11:

> The automatic stay affords one of the fundamental debtor protections provided by the bankruptcy laws.  It maintains the status quo and protects the debtor's ability to formulate a plan for the sale or other disposition of property of the estate.  The automatic stay is intended to allow the bankruptcy court to centralize all disputes concerning property of the debtor's estate so that reorganization can proceed efficiently, unimpeded by uncoordinated proceedings in other arenas.  In this regard, the automatic stay promotes equal creditor treatment and gives the debtor a breathing spell. The automatic stay is critical to debtors because it allows them to focus on their reorganization instead of ligation.

*In re Residential Capital, LLC*, No. 12-12020 MG, 2012 WL 3423285, at *4–5 (Bankr. S.D.N.Y. Aug. 14, 2012) (internal quotation marks and citations omitted).

21.     The Secured Lender relies almost entirely on its allegations relating to the Debtors' current lack of equity in the Property to support its request for stay relief.  As noted, however, the Secured Lender focuses on the current "as is" value of the Property, without regard for the stabilized value of the Property upon completion.  The sell-out price is achievable, and should be the proper basis for the analysis.

22.     Moreover, the inquiry does not end there.  Even as the parties may dispute whether the Debtors retain equity in the Property, the Secured Lender must still establish the second element or prong under Section 362(d)(2), that the Property is "not necessary to an effective reorganization."

23.     Manifestly, being able to generate the maximum recovery from the Property through the sell-out of the units is a necessary part of reorganization.  Under the familiar standard for deciding stay relief laid down by the Supreme Court in *Timbers, supra*, 484 U.S. at 375-76

("*Timbers*") the issue is whether a confirmable Chapter 11 plan can be achieved within a reasonable period of time.

24. Whether an effective reorganization can be achieved is subjective, but at this early stage, the Debtor should be given the benefit of all reasonable inferences in accordance with the Supreme Court holding that the Debtor is entitled to latitude under 11 U.S.C. §362(d)(2). *Id.*, at 375-76. Moreover, the Supreme Court also duly noted that when a motion for stay relief is made in the early stages of a bankruptcy case the courts "demand less detailed showings" of reorganization prospects. *Id.,* at 376.

25. Importantly, notwithstanding that the Secured Lender seeks stay relief to continues its UCC Article 9 foreclosure sale of the membership interests and to commence a state court foreclosure action to sell the Property, it is also notable that the Secured Lender completely fails to provide any analysis of the factors identified by the Second Circuit Court of Appeals in *In re Sonnax Indus., Inc.*, 907 F.2d 1280, 1825 (2d Cir. 1990) for used by the Courts in determining whether "cause" exists to lift the automatic stay so as to continue state law proceedings:

> (1) whether relief would result in a partial or complete resolution of the issues; (2) lack of any connection with or interference with the bankruptcy case; (3) whether the other proceeding involves the debtor as a fiduciary; (4) whether a specialized tribunal with the necessary expertise has been established to hear the cause of action; (5) whether the debtor's insurer has assumed full responsibility for defending it; (6) whether the action primarily involves third parties; (7) whether litigation in another forum would prejudice the interests of other creditors; (8) whether the judgment claim arising from the other action is subject to equitable subordination; (9) whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor; (10) the interests of judicial economy and the expeditious and economical resolution of litigation; (11) whether the parties are ready for trial in the other proceeding; and (12) impact of the stay on the parties and the balance of harms.

*Sonnax Industries, supra,* 907 F.2d at 1286. *See, also, In re Residential Capital, LLC, supra*, 2012 WL 3423285, at *5; *In re Worldcom, Inc.,* No. 02-13533, 2003 WL 22025051 at *8 (Bankr.

S.D.N.Y. Jan. 30, 2003).  Taking each of the Sonnax Factors in turn, it is readily apparent that the stay should remain in place.

### 1.  Relief Will Not Result in a Complete Resolution of the Issues (Factor No. 1)

Any request for stay relief will not result in a complete resolution of the issues.  The rights of other creditors, including mechanic's lienors and the unsecured creditors, are not protected by proceeding with the UCC foreclosure, or a foreclosure sale of the Property for that matter.  Indeed, a mezzanine sale only potentially results in a change of control without doing anything positive towards obtaining DIP financing or completing construction.  The Debtors are anxious to make necessary changes in hiring  new contractor, with creditor input, so that the Project can realize its full potential.  Lifting the automatic stay does not advance this goal.

### 2. Lifting the Automatic Stay Is Connected to and Will Interfere with the Debtors' Chapter 11 Cases (Factor No. 2)

Factor 2 addresses whether the is sufficiently related to the bankruptcy case.  In describing the type of actions unrelated to the bankruptcy proceeding in which stay relief might be warranted, Congress provided the following examples:

> [A] divorce or child custody proceeding involving the debtor may bear no relation to the bankruptcy case.  In that case, it should not be stayed.  A probate proceeding in which the debtor is the executor or administrator of another's estate usually will not be related to the bankruptcy case and should not be stayed.

H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 343-44 (1977); S Rep. No. 95-989, 95th Cong., 2d Sess. 52 (1978), reprinted in 1978 U.S.Code Cong. & Admin.News 5787, 6300.

In sharp contrast to these legislative examples, the issues presented here constitute core bankruptcy matters because they implicate the use and sale of the Debtor's Property itself (28 U.S.C. §157(b)(2)(M) and (N)); and involve the liquidation of assets of the estate and adjustment of debtor-creditor relationships under 28 U.S.C. §157(b)(2)(O).

*3. The Other Proceedings Do Not Involve the Debtors as Fiduciaries (Factor No. 3)*

The Debtors are not fiduciaries. Therefore, the third *Sonnax* Factor weighs against lifting the stay.

*4. There is No Need for the Specialized Tribunal (Factor No. 4)*

Factor 4, considering whether the issues presented need to be tried in a specialized court, also provides no assistance to the Secured Lender. Questions involving the enforcement of a secured claim present "meat and potatoes" issues for the Bankruptcy Court. As such, the state court does not have greater expertise in deciding the questions presented than the Bankruptcy Court, making this case readily distinguishable from those involving specialized areas of law, such as domestic relations issues (*See, e.g.*, *In re Newman*, 196 B.R. 700, 703 (Bankr. S.D.N.Y. 1996); *Robbins v. Robbins*, 964 F.2d 342 (4th Cir. 1992), or a specialized forum (*See In re Marketxt Holdings Corp.*, 428 B.R. 579 (S.D.N.Y. 2010) (deferring to arbitration panel specifically established by the National Association of Securities Dealers to address the issues presented)).

*5. No Insurer Has Assumed Responsibility for the Action (Factor No. 5)*

No insurer is involved here. As a result, the fifth *Sonnax* Factor does not support relief from the stay.

*6. The Non-Bankruptcy Actions do not Primarily Involve Third Parties (Factor No. 6)*

The purpose behind the Sixth Factor has been explained as follows:

> A court may lift a stay for actions which bear little relation to the bankruptcy case. *See* 2 Collier on Bankruptcy ¶ 362.07, at 362-50 (15th ed. 1982). Such lack of connection with the title 11 case occurs where the action essentially involves third parties, the debtor functions only as a bailee or conduit for the goods or proceeds in question, and resolution of the issue in no way frustrates the orderly distribution of assets of the estate.

*In re Mego Intl, Inc.*, 28 B.R. 324 (Bankr. S.D.N.Y. 1983). Here, there enforcement of the pledge against the membership interests or the sale of the Property do not involve third parties, but instead

directly concerns the Debtors, their other creditors and their assets. Thus, Factor 6 supports resolving the disposition of assets in the Bankruptcy Court.

*7. Litigation Outside of Chapter 11 Would Prejudice the Interests of Other Creditors (Factor No. 7)*

As with the first Factor, it is indisputable that the interests of other creditors are best served by denying the Motions for stay relief. Unlike the Chapter 11 cases, none of the Debtors' other creditors has standing to be heard in the context of a UCC foreclosure, and only limited standing in a state court foreclosure action relating to the Property. The disposition of the Debtors' Property and membership interests must be resolved in the context of the bankruptcy case where this Court can insure that all reasonable opportunity is provided to complete construction and maximize the value of the Property, and that any sales are conducted for the benefit of all creditors, and not just the Secured Lender.

Accordingly, the Chapter 11 cases are hindered and negatively impacted by permitting the Secured Lender to proceed outside of bankruptcy. The seventh *Sonnax* Factor thus weighs heavily against relief from stay.

*8. Whether the Secured Lender's Claims are Subject to Equitable Subordination (Factor No. 8)*

The equitable subordination of the Secured Lender's claims has not been proposed.

*9. The Secured Lender's Success in Enforcing Claims Will Not Lead to an Avoidable Judicial Lien (Factor No. 9)*

Factor 9 is not applicable, because the avoidance of liens is not an issue here. Thus, the Secured Lender cannot rely on Factor 9.

*10.    The Interests of Judicial Economy and Economical Resolution of the Actions Are Best Served by Maintaining the Automatic Stay (Factors No. 10 and 11)*

The question of judicial economy is focused on choosing between two parallel proceedings "to save judicial resources, prevent duplicative litigation, and avoid potentially inconsistent results." *In re Henderson*, 352 B.R. 439 (Bankr. N.D.Texas 2006). Here, this is an easy choice as the Bankruptcy Court has the unquestioned core jurisdiction and statutory authority to oversee the completion of construction, issues relating to DIP financing, and the sell-out of the unit for the benefit of all creditors, and not just the Secured Lender.

*11.  The Balance of Harms Favors Maintaining the Automatic Stay (Factor No. 12)*

The twelfth *Sonnax* Factor, the balance of the harms, also weighs in favor of denial of the Motions. Permitting the UCC Article 9 foreclosure sale to proceed harms the other creditors, as their chance for any recovery, while slim, will be eliminated entirely if the stay is vacated.

WHEREFORE, for all of the reasons set forth above, the Debtors respectfully submit that the Motions should be denied in its entirety.

Dated: New York, New York
      February 5, 2024

                      Goldberg Weprin Finkel Goldstein LLP
                      Attorneys for the Debtors
                      125 Park Avenue, 12th Floor
                      New York, NY 10017

                      By:    /s/ Kevin J. Nash, Esq.